No. 25-1992

# In the United States Court of Appeals
FOR THE FOURTH CIRCUIT

DELSONYA WILKINS-BAILEY,

*Plaintiff-Appellant*

v.

ESSITY PROFESSIONAL HYGIENE NORTH AMERICA LLC,

*Defendant-Appellee*

On Appeal from the U.S. District Court
for the Western District of North Carolina
No. 3:23-cv-00431

## RESPONSE BRIEF OF DEFENDANT-APPELLEE

STEPHANIE SCHUSTER
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

EMILY CUNEO DESMEDT
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ 08540
(609) 919-6600

TORY IAN SUMMEY
ELIZABETH CARSON LANE
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000

*Counsel for Defendant-Appellee*

## TABLE OF CONTENTS


**Page**

INTRODUCTION ........................................ 1

JURISDICTIONAL STATEMENT ........................................ 3

STATEMENT OF THE ISSUES ........................................ 3

STATEMENT OF THE CASE ........................................ 3

I. Factual Background ........................................ 3

A. Essity Implements a Vaccination Requirement and Accommodation Process. ........................................ 3

B. Essity Conducts Individualized Assessments of Employee Accommodation Requests. ........................................ 4

C. Wilkins-Bailey's Employment at Essity. ........................................ 5

D. Wilkins-Bailey Requests an Exemption from the Vaccination Policy. ........................................ 7

E. Essity Does Not Approve Wilkins-Bailey's Exemption Request. ...... 10

F. Essity Temporarily Engages Margaret Hilborn as an Independent Contractor. ........................................ 11

II. Procedural History ........................................ 13

SUMMARY OF THE ARGUMENT ........................................ 15

ARGUMENT ........................................ 16

I. The District Court Correctly Concluded That Wilkins-Bailey's Objection to COVID-19 Vaccination Was Personal, Rather Than Religious. ........................................ 16

A. Wilkins-Bailey Admitted That the Beliefs She Described in Her Accommodation Request Do Not Prohibit Her from Receiving a COVID-19 Vaccine. ........................................ 18




PPAB 13140790v1

## TABLE OF CONTENTS
(continued)

**Page**


B. The District Court Correctly Applied the Summary Judgment Standard and Did Not Engage in Any Weighing of Evidence............23

C. Essity Did Not Move for Summary Judgment on the Undue Hardship Defense, So the Issue Is Not Ripe for Appeal.....................29

II. The District Court Correctly Concluded That the Record Lacks Any Evidence of Race Discrimination..................................................................30

A. The District Court Correctly Concluded That Margaret Hilborn Is Not Wilkins-Bailey's Comparator. ................................................31

B. The District Court Correctly Applied the Disparate Treatment Analysis to Wilkins-Bailey's Race Discrimination Claim. ................35

CONCLUSION ..........................................................................................41

CERTIFICATE OF COMPLIANCE.......................................................43

CERTIFICATE OF SERVICE ..............................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Africa v. Com. of Pa.*,
662 F.2d 1025 (3d Cir. 1981) ....................27

*Arakas v. Comm'r, Soc. Sec. Admin.*,
983 F.3d 83 (4th Cir. 2020) ....................30

*Barnett v. Inova Health Care Servs.*,
125 F.4th 465 (4th Cir. 2025) ....................17, 23, 28

*Barwick v. Celotex Corp.*,
736 F.2d 946 (4th Cir. 1984) ....................25

*Carter v. Ball*,
33 F.3d 450 (4th Cir. 1994) ....................41

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................16

*Chalmers v. Tulon Co. of Richmond*,
101 F.3d 1012 (4th Cir. 1996) ....................17

*Cleveland v. Pol'y Mgmt. Sys. Corp.*,
526 U.S. 795 (1999)....................25

*Coleman v. Md. Court of Appeals*,
626 F.3d 187 (4th Cir. 2010) ....................31

*Dachman v. Shalala*,
9 F. App'x 186 (4th Circ. 2001) ....................17

*EEOC v. Firestone Fibers & Textiles Co.*,
515 F.3d 307 (4th Cir. 2008) ....................17

*Elderberry of Weber City, LLC v. Living Ctrs.-Se., Inc.*,
794 F.3d 406 (4th Cir. 2015) ....................16

*Ellison v. Inova Health Care Servs.*,
692 F. Supp. 3d 548 (E.D. Va. Sept. 14, 2023)....................21, 22, 23

*Farm Lab. Org. Comm. v. Stein*,
56 F.4th 339 (4th Cir. 2022) ........................................................................16

*Finn v. Humane Soc'y of the United States*,
2025 WL 3237252 (4th Cir. Nov. 20, 2025) ........................................17, 18, 27

*Gardner-Alfred v. Fed. Res. Bank of New York*,
2023 WL 6214863 (S.D.N.Y. Sept. 25, 2023) ......................................21, 26, 27

*Hawkins v. PepsiCo, Inc.*,
203 F.3d 274 (4th Cir. 2000) ........................................................................41

*Haynes v. Waste Connections, Inc.*,
922 F.3d 219 (4th Cir. 2019) ..........................................................31, 32, 33, 35

*Haywood v. Locke*,
387 F. App'x 355 (4th Cir. 2010) ..............................................................32, 33

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001)........................................................................28

*Holland v. Big River Mins. Corp.*,
181 F.3d 597 (4th Cir. 1999) ........................................................................30

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
790 F.3d 532 (4th Cir. 2015) ........................................................................16

*Hurst v. D.C.*,
681 F. App'x 186 (4th Cir. 2017) ..................................................................33

*JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*,
264 F.3d 459 (4th Cir. 2001) ........................................................................41

*Krehbiel v. BrightKey, Inc.*,
2023 WL 7984747 ........................................................................................31

*Laing v. Fed. Express Corp.*,
703 F.3d 713 (4th Cir. 2013) ........................................................................31

*Libertarian Party of Va. v. Judd*,
718 F.3d 308 (4th Cir. 2013) ........................................................................24

*Liberty Univ., Inc. v. Lew*,
733 F.3d 72 (4th Cir. 2013) ....................................................................30

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)...............................................................................31

*Perdue v. Sanofi-Aventis U.S., LLC*,
999 F.3d 954 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 767 (2022) ...................16

*Philbrook v. Ansonia Bd. of Educ.*,
757 F.2d 476 (2d Cir. 1985) ....................................................................17

*Scott v. Harris*,
550 U.S. 372 (2007)...............................................................................26

*Singleton v. Wulff*,
428 U.S. 106 (1976)...............................................................................30

*Spencer v. Va. State Univ.*,
919 F.3d 199 (4th Cir. 2019) ...........................................................32, 34

*Thomas v. City of Annapolis*,
851 F. App'x 341 (4th Cir. 2021) ............................................................32

*United States v. Sanders*,
2023 WL 8183302 (4th Cir. Nov. 27, 2023) ..............................................25

*United States v. Seeger*,
380 U.S. 163 (1965)...............................................................................17

*Welsh v. United States*,
398 U.S. 333 (1970)...............................................................................23

*Williams v. Cerberonics, Inc.*,
871 F.2d 452 (4th Cir. 1989) ..................................................................41

*Wisconsin v. Yoder*,
406 U.S. 205 (1972).........................................................................27, 28

**Statutes**

Civil Rights Act of 1866 Section 1981 ..........................................................2



PPAB 13140790v1

Civil Rights Act of 1964 Title VII..........................................................................2

Fed. R. Civ. P. 56(a)...........................................................................................16

# INTRODUCTION

This Court should affirm summary judgment for Defendant-Appellee Essity Professional Hygiene North America LLC ("Essity") because the record contains no evidence that would permit a factfinder to conclude Essity discriminated against Plaintiff-Appellant Delsonya Wilkins-Bailey ("Wilkins-Bailey") based on her race or her religion. Wilkins-Bailey's employment with Essity ended because she refused to get vaccinated against COVID-19 after Essity appropriately determined she did not qualify for an exemption from its COVID-19 vaccination policy (the "Vaccination Policy"). Essity did not treat Wilkins-Bailey differently than any other U.S. office or sales employee who refused to get vaccinated against COVID-19 and did not qualify for an accommodation or voluntarily resign. Her race had nothing to do with the termination of her employment.

Essity announced its COVID-19 Vaccination Policy in September 2021—early in the pandemic crisis—including a robust accommodation process for employees whose religious beliefs prevented them from complying. Wilkins-Bailey was one of thirty-eight Essity employees who requested a religious accommodation exemption. Essity carefully reviewed Wilkins-Bailey's request and determined she did not qualify for a religious accommodation because her objection to receiving the COVID-19 vaccine was personal, not religious. While denying Wilkins-Bailey's accommodation request, Essity gave her additional time to get vaccinated. As a result

of her refusal to comply with its Vaccination Policy, Essity ended Wilkins-Bailey's employment on December 31, 2021.

Wilkins-Bailey alleges that Essity discriminated against her based on her race and religion in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 1981 of the Civil Rights Act of 1866 ("Section 1981"). Summary judgment should be affirmed because the record contains no evidence supporting her claims.

*First*, construing the record in Wilkins-Bailey's favor, Essity is entitled to summary judgment on her Title VII failure to accommodate claim because she has admitted her religious beliefs do not prohibit her from getting vaccinated. Rather, her religious beliefs allow her to make a personal choice about whether to get any particular vaccine or medication based on her own assessment of its benefits and risks. Wilkins-Bailey's personal decision not to get vaccinated against COVID-19 did not qualify for a religious accommodation under Title VII.

*Second*, Wilkins-Bailey's race discrimination claim fails because the record contains no evidence that Essity ever treated Wilkins-Bailey less favorably than similarly situated non-Black employees, or that Essity terminated Wilkins-Bailey's employment because of her race, as opposed to her decision not to comply with Essity's Vaccination Policy.

## JURISDICTIONAL STATEMENT

Essity agrees with Wilkins-Bailey's jurisdictional statement.

## STATEMENT OF THE ISSUES

1. Whether the District Court correctly granted summary judgment to Essity on Wilkins-Bailey's Title VII religious failure to accommodate claim because Wilkins-Bailey's decision not to receive the COVID-19 vaccination was a personal choice, not based on religious belief.

2. Whether the District Court correctly granted summary judgment to Essity on Wilkins-Bailey's Title VII and Section 1981 race discrimination claims because the record contains no evidence that Essity discriminated against Wilkins-Bailey based on her race or treated her differently than similarly situated non-Black employees.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Essity Implements a Vaccination Requirement and Accommodation Process.

Essity is a global health and hygiene company. JA198, ¶ 2. On September 29, 2021, during the surge in the Delta variant of COVID-19, Essity announced that it would require its office and sales employees in the United States to become vaccinated against COVID-19 to protect the health of its employees and customers,



PPAB 13140790v1

many of which are in the healthcare industry. JA342, at 179:13-15; JA392-399. Essity's COVID-19 Vaccination Policy stated that employees who could not receive a COVID-19 vaccine for medical or religious reasons could request an accommodation exempting them from the policy. JA395-396. The policy also stated that Essity would place unvaccinated employees who did not qualify for exemptions on unpaid leave on November 30, 2021, until they presented proof of vaccination. JA395. If employees did not comply by December 31, 2021, their employment with Essity would end. *Id.*

### B. Essity Conducts Individualized Assessments of Employee Accommodation Requests.

In its religious accommodation request form, Essity asked employees to (1) explain in their own words why they were requesting an exemption, (2) describe the religious principles that guided their objection to immunization, and (3) indicate whether they were opposed to all immunizations and, if not, explain how they differentiated between them. JA198-199, ¶ 4; JA348, at 185:21-23; JA400-407. If Essity felt it required more information to understand an employee's beliefs, it asked the employee follow-up questions. JA199, ¶ 5.

A Religious Exemption Review Committee carefully assessed each accommodation request before approving or denying it. *Id.* ¶¶ 6, 8. When assessing accommodation requests, the Committee applied guidance from the U.S. Centers for Dis-

ease Control and Prevention, other public health authorities, and the Equal Employment Opportunity Commission. *Id.* ¶ 8. The Committee also consulted with legal counsel. *Id.* The Committee did not consider the race of any employee who requested an accommodation. *Id.* ¶ 7.

Thirty-eight Essity employees requested religious exemptions from the Vaccination Policy. *Id.* ¶ 9. Essity approved 31.58% of all the requests, 29.03% of the requests it received from white employees (9 of 31), 42.86% of the requests it received from non-white employees (3 of 7), and 33.33% of the requests it received from Black employees (2 of 6). *Id.* Essity denied the accommodation requests of twenty-two white employees, and it denied the accommodation requests of four non-white employees, including Wilkins-Bailey's request. *Id.*

### C. Wilkins-Bailey's Employment at Essity.

Wilkins-Bailey was initially hired as an e-Commerce Coordinator at BSN Medical Inc. ("BSN"). JA415-419, at 15:2-17:3, 18:4-19:1. In Spring 2017, Essity, formerly known as SCA, purchased BSN, and Steven McNickle became Wilkins-Bailey's supervisor. JA425, at 45:2-19; JA427, at 47:7-13; JA423, at 43:5-24. Wilkins-Bailey eventually became a Sales Administration Coordinator. JA222, at 59:23-60:14; JA227-228, at 64:14-65:5. In this role, she acted as a self-described "Jane of all trades," supporting retail customer accounts. JA222-223, at 59:9-60:20; JA227-229, at 64:14-66:8. Visiting customer accounts "was custom" for Wilkins-Bailey.

JA223-224, at 60:15-61:10. Wilkins-Bailey also traveled to Essity's warehouses three to four times per month to ensure that orders were fulfilled correctly and efficiently. JA224-225, at 61:11-62:21.

In June 2020, after the death of George Floyd, Essity's President, Don Lewis, sent an email to all employees expressing his concern for Black Americans, noting that Essity would not tolerate racial bias. JA278-279, at 115:16-116:18; JA385-388. Wilkins-Bailey replied to Lewis's email, expressing appreciation for his message. JA279, at 116:19-22; JA385-386. She shared how her managers had supported her during a time of "emotional chaos" by creating a safe space for her to share her feelings. *Id.* Wilkins-Bailey wrote that while the organization had little minority representation in its leadership, she "[could]n't find not one heart at any tier that ha[d] made [her] feel anything other than 'sincerely valued' in this organization." *Id.* She wrote that "NOTHING or NOONE could stop the Praise [she] h[ad] for [Essity]." *Id.*

After Wilkins-Bailey responded to Lewis's email, Essity's Vice President of Sales and Marketing, Mike Feenan, reached out to her to see how she was doing and if there was anything else she wanted to discuss. JA247-248, at 84:10-85:8; JA249, at 86:2-22; JA280-281, at 117:13-118:10. Essity did not discipline or criticize Wilkins-Bailey for responding to Lewis's email, and several colleagues gave Wilkins-Bailey positive feedback about her message. JA282-283, at 119:5-120:23.

In October 2021, Wilkins-Bailey sent another manager, Carrie Harcus, an article about why Black employees might not want to return to the office. JA250, at 87:12-14; JA379-384. In the email, Wilkins-Bailey thanked Harcus for her leadership and called her empathetic. JA252, at 89:9-16; JA379-84. Harcus responded with positive feedback and told Wilkins-Bailey she shared the article with Human Resources and executive leadership. JA251-252, at 88:25-89:2, 89:17-21; JA379-384. Wilkins-Bailey has testified that she "absolutely" never felt like anybody on her team discriminated against her. JA236, at 73:13-23. She testified that she believes Essity is a "blessing" and a "phenomenal company." JA556-557, at 132:24-133:5.

### D. Wilkins-Bailey Requests an Exemption from the Vaccination Policy.

On October 11, 2021, Wilkins-Bailey requested an exemption from the Vaccination Policy. JA400-407. In her request form, Wilkins-Bailey wrote that she does not smoke or drink alcohol, and she avoids sugar, gluten, and "any other altered additives that may harm [her] body." *Id.* Wilkins-Bailey wrote that "the substances (i.e., experimental tech to precious fetus/human samples etc) in these Covid 19 injections prevent me from getting any Covid-19 vaccination." *Id.* She also cited in her request five Bible verses, including one about the body being a temple of the Holy Spirit. JA405. On October 25, 2021, Wilkins-Bailey responded to follow-up questions from Essity, writing that she has objected to all vaccines her entire adult life. JA367, at 204:12-22; JA408-413; JA466-467, at 6:25-7:23.

However, Wilkins-Bailey has since testified that any belief she had about alleged "substances (i.e., experimental tech to precious fetus/human samples etc)" in the COVID-19 vaccines did not contribute to her decision not to get vaccinated. JA362-366, at 199:18-203:6. Wilkins-Bailey also clarified that she cited Bible verses in her request to convey that you must "[d]iscern within yourself what you put into your body because God gave it to you." JA355-356, at 192:6-193:12. She testified that her religious beliefs do not generally prohibit her from taking medication or vaccines. JA358, at 195:7-24 ("Q. So going back to discernment you said that -- I asked -- this passage doesn't prohibit you from taking all medications because you do take some, right? A. Yes, ma'am."). Nor does she follow any particular teachings when deciding what to put in her body. JA361, at 198:3-12. Rather, Wilkins-Bailey listens to her body and how it reacts to certain substances, and decides which vaccines and medication to take herself, relying on the "Spirit to give [her] ease and peace about a decision, after meditation." JA361, at 198:3-19; JA358, at 195:7-24.

Wilkins-Bailey received the Hepatitis A vaccine as an adult, but did not take a flu vaccine because she did not think she needed it. JA306, at 143:17-19; JA308-309, at 145:11-146:25; JA332, at 169:1-13; JA917-925; JA515, at 87:7-13. She initially took Metformin to treat her diabetes, but eventually stopped because it caused severe side effects. JA263-264, at 100:15-101:20. She receives injections in her eyes at her doctor's recommendation, but she will not take insulin to treat her diabetes

because she believes insulin "destroys the kidneys." JA501-502, at 45:1-46:18. She has her blood drawn several times a year due to her anemia, but refused iron infusions because she "just didn't feel that was the thing to do." JA266-268, at 103:25-104:21, 105:14-16. Wilkins-Bailey received anesthesia before an eye surgery in February 2022, and she took ibuprofen after the surgery for pain relief. JA493-496, at 37:24-40:6; JA513, at 85:1-9; JA516, at 88:11-20. Regarding the COVID-19 vaccine, Wilkins-Bailey stated she "just was not led to feel okay" about it. JA331, at 168:2-9.

Wilkins-Bailey clarified at her deposition that while she was raised around people who belonged to several Christian denominations, the Nation of Islam, and the Jehovah's Witness faith, and was influenced by and values tenets of all three, she currently considers herself "a God fearing woman striving to be Christlike." JA313-314, at 150:17-151:22; JA316-317, at 153:6-154:13. Understanding that Jehovah's Witnesses are not opposed to vaccination, Wilkins-Bailey testified about her own religious beliefs: "at the end of the day you have those in all religions—it's a choice. So you have some that were aligned and some that didn't. It's a choice . . . It's a personal decision." JA320-321, at 157:8-158:5; JA390-391. No particular teaching of her religion required her to object to COVID-19 vaccination—it was up to her, as an individual, to make that decision for herself. JA321, at 158:6-11. She summed up her position as "my choice, my body." JA565-566, at 141:25-142:17.

### E. Essity Does Not Approve Wilkins-Bailey's Exemption Request.

Essity does not dispute that Wilkins-Bailey is religious and sincerely holds certain religious beliefs. However, Essity's Religious Exemption Review Committee concluded that Wilkins-Bailey's submissions did not show that her religious beliefs prevented her from complying with the Vaccination Policy. JA199-200, ¶ 10. On November 19, 2021, Essity's Human Resources Director, Fred Albrecht, notified Wilkins-Bailey via email that Essity had not approved her accommodation request, and offered her additional time to get vaccinated. JA472-473, at 12:24-13:22; SA1-2.[1] The email made clear that Wilkins-Bailey needed to get vaccinated to remain employed. SA1-2.

On December 3, 2021, HR Director Lenny Qualtiere, with McNickle, called Wilkins-Bailey. JA475-476, at 15:19-16:9; JA488-489, at 32:17-33:15; SA3-10. They asked Wilkins-Bailey if she was going to get vaccinated, and she said she was not. JA480-481, at 20:23-21:2; SA3-4. Qualtiere offered Wilkins-Bailey the option of remaining actively employed with Essity through December 31 through a voluntary separation agreement. JA476-479, at 16:21-19:12; JA489, at 33:16-25; SA3-10. Wilkins-Bailey refused that agreement, opting instead to begin administrative leave

---

[1] The Joint Appendix inadvertently omitted portions of two exhibits and Essity has filed a consented-to motion to file a Supplemental Joint Appendix, as amended. *See* Docs. 23 and 26. The Court granted Essity's motion and the exhibits are included in the Supplemental Joint Appendix, SA1 through SA16.

the next business day. JA479, at 19:13-18; JA481-483, at 21:14-23:12; SA3-10. Wilkins-Bailey was placed on administrative leave, effective December 6, 2021, and her employment with Essity ended December 31, 2021. JA200, ¶ 11.

### F. Essity Temporarily Engages Margaret Hilborn as an Independent Contractor.

Margaret Hilborn—who Wilkins-Bailey alleges is her comparator (*see* Doc. 13, at 32-40)—is a former Essity employee who BSN Medical (then Smith & Nephew) hired in June 1999. Hilborn worked as a Rebates Analyst in Essity's Health and Medical Solutions Rebates department until her December 31, 2021 retirement. JA572-573, at 16:3-17:11; JA576-577, at 20:22-21:10; JA630, at 86:13-14; JA1070, ¶ 3. Hilborn is white. JA658, at 150:10-16. Hilborn worked on a different team than Wilkins-Bailey. JA613-614, at 61:10-62:24. She had two direct reports. JA577-578, at 21:11-22:7; JA598-601, at 46:10-49:10; SA15, ¶ 6.

When Essity announced its Vaccination Policy, Hilborn had already decided not to get vaccinated. She therefore decided to retire in December 2021 rather than request an exemption or have her employment terminated. JA616-617, at 64:20-65:3; JA623-624, at 71:18-72:1; JA627-628, at 83:2-84:24; JA631, at 87:11-20; SA15, ¶ 5. Shortly after Hilborn announced her retirement, one of Hilborn's direct reports announced that she would be transferring to another department. JA578-581, at 22:21-25:4. The plan, therefore, was for Hilborn and her two direct reports to train the two new employees Essity would hire to replace them. *Id.*

Essity's rebates team performs complicated work using a specialized computer operating system. JA587-589, at 35:7-37:9; JA593-595, at 41:13-43:3; SA15, ¶ 7. Hilborn explained that someone with experience with the operating system or in the medical industry could pick up the work quicker. JA601-604, at 49:11-51:7, 52:1-25. Unfortunately, neither of the two employees Essity hired to replace Hilborn and her direct report had that experience, so Hilborn trained them "as if they were new." JA605-606, at 53:23-54:13.

At the time of Hilborn's retirement, her supervisor, James Pable, had been in his position for just over six months. JA584, at 28:17-23; JA608-609, at 56:13-57:3. Pable did not feel he knew the rebates function well enough to take over Hilborn's duties after she retired. JA610-611, at 58:10-59:24. Therefore, Pable asked Essity to engage Hilborn temporarily as a third-party independent contractor so she could continue training his team's two new hires and pass on her twenty-two years of institutional knowledge. JA637-641, at 93:12-97:22; JA652, at 112:11-18; SA15-16, ¶ 9.[2] For four months after her employment with Essity ended in December 2021, Hilborn assisted Essity, as needed, as an independent contractor employed by a third-party staffing company. JA639-641, at 95:7-97:22; JA644-645, at 100:15-101:3; SA16, ¶

[2] McNickle did not ask that Essity engage Wilkins-Bailey as an independent contractor. *Id.* at 154:19-155:3; JA200, ¶ 12.

10. In addition to Hilborn, Essity offered to engage one other former Essity employee as an independent contractor: Nicki Smith, who is Black. JA655-656, at 127:17-128:22; SA16, ¶ 12.

## II. Procedural History

After filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on June 1, 2022, Wilkins-Bailey initiated this action by filing a Complaint in the United States District Court for the Western District of North Carolina on July 18, 2023. *See* JA117-119; JA10-131. In her Complaint, Wilkins-Bailey claims that Essity discriminated against her based on her race and religion, and retaliated against her, in violation of Title VII and Section 1981. *See generally* JA10-36. Specifically, Wilkins-Bailey claims that Essity (1) failed to accommodate her religious beliefs, (2) treated her differently than similarly situated non-Black employees, and (3) retaliated against her for complaining about a perceived lack of racial diversity at Essity by denying her request to be exempt from the Vaccination Policy and ultimately terminating her employment. *See id.*

After the close of discovery, on January 24, 2025, Essity moved for summary judgment on all Wilkins-Bailey's claims. JA159-684. On February 21, 2025, Wilkins-Bailey filed an opposition to Essity's motion for summary judgment. JA685-781. Essity filed a reply in further support of its motion for summary judgment on

March 10, 2025. JA782-797. On June 12, 2025, the District Court heard oral arguments on Essity's motion (JA804-885) and, on July 24, 2025, the District Court granted summary judgment to Essity on all Wilkins-Bailey's claims. JA886-913.

The District Court held that Wilkins-Bailey failed to establish a prima facie failure to accommodate claim because her objection to receiving a COVID-19 vaccine was not religious in nature. *See* JA894; JA897-904. The District Court also held that Wilkins-Bailey failed to establish a prima facie racial disparate treatment claim because she did not identify any evidence that she was treated differently from similarly situated non-Black employees. *See* JA907; JA912. Finally, the District Court held—and Wilkins-Bailey conceded—that she had waived her religious disparate treatment claim (if any) and her retaliation claims. *See* JA904; JA913; JA876, at 73:2-14.

Thereafter, on August 21, 2025, Wilkins-Bailey filed a notice of appeal. JA915-16. As discussed above, Wilkins-Bailey has limited her claims on appeal to (1) her failure to accommodate claim, and (2) her racial disparate treatment claim.[3]

---

[3] Wilkins-Bailey has not appealed the District Court's ruling that she waived her remaining claims. *See generally* Doc. 13.

## SUMMARY OF THE ARGUMENT

This Court should affirm summary judgment for Essity because the record does not contain any evidence that would permit a factfinder to conclude Essity discriminated against Wilkins-Bailey based on her race or her religion.

First, the District Court correctly granted summary judgment to Essity on Wilkins-Bailey's religious failure to accommodate claim because the undisputed material facts show that, although Wilkins-Bailey is religious, the reason she refused to get vaccinated was not. Wilkins-Bailey admitted her religious beliefs do not prohibit her from getting vaccinated. Rather, she chooses whether to get any particular vaccine or medication based on her own assessment of its benefits and risks. Wilkins-Bailey's personal decision not to get vaccinated against COVID-19 did not qualify for a religious accommodation under Title VII.

Second, the District Court correctly granted summary judgment to Essity on Wilkins-Bailey's racial disparate treatment claim because she did not identify any direct evidence of race discrimination, and the undisputed material facts show that she was treated no differently than similarly-situated non-Black employees. Specifically, Hilborn is not Wilkins-Bailey's comparator and the other non-Black employees that Wilkins-Bailey points to were not treated more favorably than her.

## ARGUMENT

This Court reviews the District Court's grant of summary judgment de novo, applying the same standard as the District Court. *Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 346 (4th Cir. 2022); *Elderberry of Weber City, LLC v. Living Ctrs.-Se., Inc.*, 794 F.3d 406, 411 (4th Cir. 2015). In general, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (citation omitted). A party, such as Wilkins-Bailey, can only create a dispute of fact through admissible evidence. *See, e.g.*, *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.1 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 767 (2022).

### I. The District Court Correctly Concluded That Wilkins-Bailey's Objection to COVID-19 Vaccination Was Personal, Rather Than Religious.

The District Court correctly granted summary judgment to Essity on Wilkins-Bailey's religious failure to accommodate claim because the undisputed material facts show that, although Wilkins-Bailey is religious, the reason she refused to get vaccinated was not. To state a Title VII failure to accommodate claim, Wilkins-

Bailey must show that: (1) she had a bona fide religious belief that conflicted with an employment requirement; (2) she informed Essity of this belief; and (3) she was disciplined for failing to comply with the conflicting employment requirement. *See Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996) (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)); *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008). The District Court correctly held that Wilkins-Bailey cannot satisfy the first prong.

To satisfy the first prong, a plaintiff must show that her belief that conflicts with COVID-19 vaccination is both (1) sincerely held and (2) religious in nature. *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 470 (4th Cir. 2025) (citing *United States v. Seeger*, 380 U.S. 163, 185 (1965)). The belief must be both (1) an "essential part of a religious faith," *and* (2) "plausibly connected with [her] refusal to receive the COVID-19 vaccine." *Finn v. Humane Soc'y of the United States*, 2025 WL 3237252, at *3 (4th Cir. Nov. 20, 2025) (citing *Barnett*, 125 F.4th at 471). Thus, just because a person is religious does not mean she is entitled to a religious accommodation if she refuses to get vaccinated "because of health or safety concerns." *Id.* (citing *Barnett*, 125 F.4th at 471). Title VII only requires accommodation of objections that are "grounded in religious, rather than secular reasons (medical, personal, etc.)." *Id.* (citing *Dachman v. Shalala*, 9 F. App'x 186, 192 (4th Circ. 2001) ("While an employer has a duty to accommodate an employee's *religious* beliefs, [it] does

not have a duty to accommodate an employee's preferences." (emphasis in original)). Employees do not "have a blanket privilege to claim a religious exemption whenever they see fit." *Id.* at *4.

The District Court correctly found that the evidence of record, even weighed in Wilkins-Bailey's favor, would not permit a reasonable factfinder to conclude that Wilkins-Bailey's objection to receiving a COVID-19 vaccine was religious. Wilkins-Bailey has admitted that her religious beliefs allow her to make *personal* decisions about whether to get vaccinated:

> Q. And it says that Jehovah's Witnesses believe that whether to get vaccinated is a personal decision for each Christian to make?
>
> A. There you go. It's a personal decision.
>
> Q. Is that your belief as well?
>
> A. Absolutely.

JA320-321, at 157:25-158:11.

Wilkins-Bailey acknowledged her religious beliefs neither prohibited nor required her to get a COVID-19 vaccine. Rather, it was up to her "as an individual to make that decision." *Id.*

### A. Wilkins-Bailey Admitted That the Beliefs She Described in Her Accommodation Request Do Not Prohibit Her from Receiving a COVID-19 Vaccine.

In the accommodation request she submitted to Essity, Wilkins-Bailey represented that she was seeking an exemption from the COVID-19 Vaccination Policy

for two reasons: (1) the "substances (i.e. experimental tech to precious fetus/human samples etc)" in COVID-19 vaccines prevented her from "getting any Covid-19 vaccination due to [her] closely held religious beliefs," and (2) she views her body as a temple. JA400-407. The record demonstrates, however, that neither of those two beliefs prevented her from getting vaccinated against COVID-19.

Wilkins-Bailey has conceded that, despite what she wrote on her accommodation request, she does not have any religious belief about fetal cells that prevented her from becoming vaccinated. JA365-366, at 202:23-203:6 ("Q. [Y]ou didn't object to COVID vaccination because you believed there were fetus, slash, human samples in them; is that right? A. Right. Yes, ma'am."); *see also* Doc. 13, at 18 ("The deposition of Wilkins-Bailey revealed that she never actually cared about what was in the COVID-19 vaccine as a basis of her decision, and that she never knew or confirmed that 'precious experimental fetal tech' was used in the making of the vaccines."). It is therefore undisputed that Wilkins-Bailey's objection to the COVID-19 vaccine was not based on any belief she holds about fetal cells, "human samples," or abortion.

Nor does Wilkins-Bailey have a belief about her body being a temple that would have prevented her from complying with Essity's COVID-19 Vaccination Policy. She has confirmed that her belief that her body is a temple does not require her to forgo any particular vaccines or medication. JA356, at 193:13-17 ("Q. [T]his

passage, it doesn't prohibit you from putting all medication into your body, correct, because you have taken some medication? A. The operative word is discernment so it is for me."). Rather, Wilkins-Bailey testified that because she views her body as a temple, she is simply mindful about what she puts in it. JA355-366.

Wilkins-Bailey does not follow any teachings when deciding what to put in her body. JA361, 198:3-12. Instead, she makes those decisions by "[d]iscern[ing] within [herself]." JA355-356, JA361. She listens to her body and how it reacts to certain substances, decides which medication to take herself, and then relies on the "Spirit to just give [her] ease and peace about a decision." JA361, 198:3-19; JA358, at 195:7-24

Her personal assessments have led her to take many medications and decline others. She has received injections in her eyes at her doctor's recommendation, but will not take insulin to treat her diabetes because she believes insulin "destroys the kidneys." JA501-502, at 45:1-46:18. She has her blood drawn several times a year due to her anemia, but refused iron infusions because she "just didn't feel that was the thing to do." JA266-268, at 103:25-104:21, 105:14-16. She received anesthesia before an eye surgery in February 2022, and took ibuprofen after it for pain relief. JA493-496, at 37:24-40:6; JA513, at 85:1-9; JA516, at 88:11-20.

Wilkins-Bailey testified that she does not follow any particular diet, and soda is the only food or drink she completely avoids. JA271-72, at 108:11-109:12. She is

"skeptical about a lot of things in this day and time" because "our food is no longer the food that [we] grew up with." JA325-326, at 162:18-163:4. She is therefore "hesitant to do a lot of things without heavy research." *Id*. She attended a town hall with Robert F. Kennedy, Jr. and expressed her appreciation to him for his warnings and concerns about vaccines. JA339-340, at 176:5-177:12. She took a hepatitis A vaccine, which she described as "something that's been around for decades, decades," after a nurse explained to her that she needed the vaccine. JA331, at 168:2-19.

However, Wilkins-Bailey testified that she never even considered whether anything in the COVID-19 vaccine would harm her body, or whether taking a COVID-19 vaccine would not "protect her temple," because she never considered getting vaccinated against COVID-19. JA323-325, at 160:15-162:4 ("Q. And what was it about the vaccine that you felt would not allow you to protect your temple? A. I guess I didn't even think about that because I trusted my body to be able to fight whatever is thrown against it. . . . Q. Well, when did you make up your mind not to get vaccinated against COVID? A. I wasn't getting vaccinated, I didn't even think about it.").

Wilkins-Bailey's beliefs therefore did not qualify for a religious accommodation under Title VII. *See, e.g.*, *Ellison v. Inova Health Care Servs.*, 692 F. Supp. 3d 548 (E.D. Va. Sept. 14, 2023); *see also, e.g., Gardner-Alfred v. Fed. Res. Bank of New York*, 2023 WL 6214863 (S.D.N.Y. Sept. 25, 2023). In *Ellison*, for example, an

employee, like Wilkins-Bailey, requested an exemption from his employer's COVID-19 vaccination mandate because "the Bible requires Christians to treat their bodies as 'temple[s] of the Holy Spirit,'" and because "he prayed about the vaccine and 'the answer that [God] revealed was that [he] must protect [his] temple from the vaccine and refuse it.'" *Ellison,* 692 F. Supp. 3d at 558. Another employee requested an exemption based on a similar belief that his body is a "temple of the Holy Spirit" and because he too prayed about decisions concerning his body. *Id.* at 558-59. The court held that neither plaintiff could demonstrate their objections to the vaccine were religious. *Id.* at 558 ("[E]xemption requests 'predicated fundamentally on [ ] concerns with the safety of the vaccine and [plaintiffs'] right to bodily integrity'—even if based on the 'belief that [plaintiff's] body is a temple' and 'ratified by prayer'—are fundamentally 'medical judgments . . . not matters of religious belief.'" (citation omitted)). The court held that the second plaintiff's "belief that if, after his prayer, 'God answers and interdicts [his] participation', amounts to the type of 'blanket privilege' that undermines our system of ordered liberty. Certainly, if taken to its logical extreme, [plaintiff's] claim would serve as a 'limitless excuse for avoiding all . . . obligations.'" *Id.* at 559 (citation omitted).

Like the plaintiffs in *Ellison*, Wilkins-Bailey was not entitled to a religious accommodation. Complying with Essity's Vaccination Policy would not have conflicted with her alleged belief that her body is a temple. Despite believing that her

body is a temple, Wilkins-Bailey has taken many different medications and received at least one vaccine. Simply put, Wilkins-Bailey's religious beliefs permit her to decide for herself whether to get vaccinated against COVID-19 because her decisions about what to put in her body are personal. JA320-321, at 157:8-158:5 ("[A]t the end of the day you have those in all religions—it's a choice. So you have some that were aligned and some that didn't. It's a choice. . . . It's a personal decision."); JA565-66, at 141:25-142:17 ("my choice, my body"); JA390-391. Wilkins-Bailey's beliefs about the COVID-19 vaccine "do not go to an essential part of a religious faith and are therefore not religious in nature." JA903 (citing *Barnett*, 125 F.4th at 470); *Welsh v. United States*, 398 U.S. 333, 343 (1970). No reasonable factfinder could conclude that Wilkins-Bailey's religious beliefs required Essity to exempt her from its COVID-19 Vaccination Policy as a religious accommodation.

### B. The District Court Correctly Applied the Summary Judgment Standard and Did Not Engage in Any Weighing of Evidence.

On appeal, Wilkins-Bailey argues that the District Court failed to give sufficient weight to her "claim that her refusal to take the COVID-19 vaccine was an essential belief of her religious faith." Doc. 13, at 16. But that argument is nothing more than a request that the Court accept Wilkins-Bailey's conclusory allegation that her objection to the vaccine was religious even though the undisputed evidence makes clear that her decision not to take the vaccine was personal.

"Courts are required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party" in considering a motion for summary judgment. JA892 (citing *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 213 (4th Cir. 2013)). That said, "conclusory allegations or denials" are insufficient to defeat summary judgment. *See id.*

Wilkins-Bailey argues that the District Court misapplied the summary judgment standard by weighing the evidence in the record, rather than viewing it in the light most favorable to her. *See* Doc. 13, at 28. That is incorrect. To the contrary, the District Court carefully analyzed the record in the light most favorable to Wilkins-Bailey and determined that it contains no evidence that would permit a reasonable factfinder to conclude that Wilkins-Bailey's personal decision not to get vaccinated was rooted in a religious belief.

The only conflict that Wilkins-Bailey has identified on appeal is between her conclusory, self-serving arguments and the undisputed record evidence. That conflict is insufficient to overcome summary judgment. *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement.") (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)); *see also United States v. Sanders*, 2023 WL 8183302, at *2 (4th Cir. Nov. 27, 2023) ("When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Although Wilkins-Bailey now argues on appeal that she chose not to get vaccinated against COVID-19 because she "ha[d] to be protective of [her] temple," she has admitted that she "never actually cared about what was in the COVID-19 vaccine" or even thought about whether taking a COVID-19 vaccine would harm her body. *See* Doc. 13, at 17-18. Although she argues on appeal that she has never received any vaccinations, she admits she took a Hepatitis A vaccine as an adult. Although she argues that she has never been one to take medications, the record shows she has in fact taken many medications, including ibuprofen and anesthesia, and received various injections and medical procedures. The record does not contain any evidence at all that Wilkins-Bailey holds religious beliefs that actually prevented her from getting vaccinated against COVID-19. Wilkins-Bailey's insistence that her objection to COVID-19 vaccination was religious, despite her admission that she made a personal choice not to get vaccinated without ever even considering whether a COVID-19 vaccine would harm her body, is insufficient to create an issue of material fact.

Wilkins-Bailey argues that, because she identifies as a religious person, the District Court should have disregarded the record and accepted at face value that her

decision not to get vaccinated was religious. *See* Doc. 13, at 26 ("It is unclear how Essity and the district court judge can acknowledge someone is a 'religious person' then put a microscope to their religious beliefs"). Indeed, she argues that "[w]hen a person is truly religious, their beliefs will be displayed in their daily walk and habits, down to the foods they eat and their preference of remedies for healing, just as in Wilkins-Bailey's case." *Id.*; *see also id.* at 21 ("[I]f you're a religious person and you believe and your religion drives your morality, your decisions between right and wrong, then it always becomes a personal decision, unless it's verbatim[] written in your religion that says you cannot take the COVID-19 vaccine."). In other words, Wilkins-Bailey suggests that because she generally is a person of faith, every decision she makes is a religious decision that qualifies for a Title VII accommodation. *See, e.g.*, *Gardner-Alfred*, 2023 WL 6214863, at *14 ("Plaintiffs ask the Court to adopt a categorical rule that whenever a plaintiff asserts a religious reason for not complying with a civic obligation – no matter how contrived or conclusory the assertion – such plaintiff is entitled to a jury trial. . . .Plaintiffs' argument finds no support in the law.")

However, courts have repeatedly rejected Wilkins-Bailey's argument that she was entitled to an accommodation just because she believes all her life's activities are cloaked with religious significance. "[T]he very concept of ordered liberty precludes allowing [Wilkins-Bailey], or any other person, a blanket privilege to make

[her] own standards on matters of conduct in which society as a whole has important interests." *Africa v. Com. of Pa.*, 662 F.2d 1025, 1031 (3d Cir. 1981) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)); *see also*, *e.g.*, *Gardner-Alfred*, 2023 WL 6214863, at *18-21 (granting summary judgment in favor of employer because plaintiff who allegedly viewed her body as a temple, opposed invasive Western medical techniques, and did not put foreign, "mankind" medicines in her body had, like Wilkins-Bailey, received injections, taken other medications, and undergone medical procedures).

Indeed, as this Court recently reaffirmed, employees do not "have a blanket privilege to claim a religious exemption whenever they see fit." *Finn*, 2025 WL 3237252, at *3-4 (citing *Barnett*, 125 F.4th at 471) (beliefs must be "plausibly connected with her refusal to receive the COVID-19 vaccine."); *see also* JA816, at 13:7-12 ("[J]ust because you say that you are religious doesn't mean that every decision that you make is entitled to a religious accommodation. It has to be rooted in your religious belief. . . .").

If the Court accepted Wilkins-Bailey's argument that her personal decision was entitled to a religious accommodation, every employee who identified as religious would be entitled to a religious accommodation for every single decision they made, allowing those employees to evade any job requirement with which they disagreed, unless their employers could demonstrate undue hardship. This is the very

reason that the Supreme Court held that "ordered liberty" precludes granting individuals a blanket privilege to make their own standards of conduct by characterizing all their decisions as religious. *Yoder*, 406 U.S. at 215.

Indeed, while the Court must give great weight to a plaintiff's assertion that her "belief is an essential part of a religious faith," the inquiry does not end there. *See Barnett*, 125 F.4th at 471. To overcome summary judgment, a plaintiff must *also* establish that her religious belief actually conflicts with her employer's policy. *See, e.g.*, *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001) (A policy conflicts with a plaintiff's religious belief when it "forces them to engage in conduct that their religion forbids or . . . prevents them from engaging in conduct their religion requires."). She must identify sufficient evidence to permit a factfinder to conclude that her plaintiff's religious belief is the reason she refused to get vaccinated.

Here, the undisputed evidence would not permit a factfinder to conclude that Wilkins-Bailey's religious beliefs prevented her from complying with the Vaccination Policy, since she admitted that her religious beliefs allow her to make a personal decision about whether to take a particular vaccine. The undisputed record evidence would therefore not permit a reasonable factfinder to conclude that Wilkins-Bailey qualified for a religious accommodation under Title VII. *See* JA181-182. The District Court did not engage in any weighing of the evidence because there is none—

aside from Wilkins-Bailey's say-so—supporting that Wilkins-Bailey's anti-vaccination beliefs are religious in nature.

### C. Essity Did Not Move for Summary Judgment on the Undue Hardship Defense, So the Issue Is Not Ripe for Appeal.

Wilkins-Bailey argues that Essity failed to show that it could not accommodate her religious beliefs without facing an undue hardship. *See* Doc. 13, at 29. However, Essity did not move for summary judgment on the undue hardship defense (*see generally* JA162-95) and the District Court did not issue a ruling on that defense. *See generally* JA886-913. The issue is therefore not ripe for appeal. *See* Doc. 13, at 1.

"Generally, issues that were not raised in the district court will not be addressed on appeal." *Holland v. Big River Mins. Corp.*, 181 F.3d 597, 605 (4th Cir. 1999). There are exceptions—namely, (1) where the proper resolution is beyond any doubt, (2) where injustice might otherwise result, (3) where refusal to review would constitute plain error, or (4) where there is an intervening change in the case law. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 105 (4th Cir. 2020) (citing *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 104 (4th Cir. 2013)). In determining whether any of these exceptions apply, this Court has considered "(1) whether both parties had ample opportunity to develop facts pertaining to the issue; (2) whether the issue is primarily a question of law; (3) whether the issue was briefed and argued on appeal; (4) whether the proper outcome

is beyond doubt, rendering a remand pointless; and (5) whether a discretionary remand to the district court for consideration of the waived issue in the first instance would produce injustice for a party." *See id.*

None of those factors are present here and Wilkins-Bailey has put forth zero evidence or argument to the contrary. In fact, Essity's position is that even if Wilkins-Bailey had qualified for a religious accommodation (she did not), accommodating her would have posed an undue hardship. However, neither Essity nor Wilkins-Bailey moved for summary judgment on the undue hardship defense. This Court therefore should not address the issue on appeal.

## II. The District Court Correctly Concluded That the Record Lacks Any Evidence of Race Discrimination.

The District Court correctly granted Essity's motion for summary judgment on Wilkins-Bailey's race discrimination claim because she did not identify any direct evidence of race discrimination, and the undisputed material facts show that she was treated no differently than similarly situated non-Black employees. Absent direct evidence of race discrimination, the familiar three-pronged, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* applies.[4] 411 U.S. 792 (1973); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019); *Laing*

[4] Race discrimination claims brought under Section 1981 are analyzed under the same framework as discrimination claims brought under Title VII. *Krehbiel v. BrightKey, Inc.*, 2023 WL 7984747, at n.* (4th Cir. Nov. 17, 2023).

*v. Fed. Express Corp.*, 703 F.3d 713, 718-19 (4th Cir. 2013). Under this framework, Wilkins-Bailey must first show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). The District Court correctly held that Wilkins-Bailey failed to establish the final prong.

### A. The District Court Correctly Concluded That Margaret Hilborn Is Not Wilkins-Bailey's Comparator.

The District Court correctly held that former Essity employee Margaret Hilborn is not Wilkins-Bailey's comparator because Hilborn (1) had a different job than Wilkins-Bailey, (2) worked on a different team than Wilkins-Bailey, and, most importantly, (3) did not request an exemption from the Vaccination Policy.

As the District Court stated, Title VII "plaintiffs are required to show that they are similar *in all relevant respects* to their comparator." JA908 (citing *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *Spencer v. Va. State Univ.*, 919 F.3d 199, 207-208 (4th Cir. 2019)) (emphasis added). Depending on the particular circumstances, determining whether a plaintiff is, in fact, similar in all relevant respects typically requires a court to consider, "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Id.* (citing *Spencer*, 919 F.3d at 207; *Thomas v. City of Annapolis*, 851 F.



PPAB 13140790v1

App'x 341, 347 (4th Cir. 2021)). More broadly, "to establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator . . . [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes*, 922 F.3d at 223-24 (quoting *Haywood*, 387 F. App'x at 359). Applying this standard, the District Court concluded that Hilborn was not Wilkins-Bailey's comparator because—most significantly—Hilborn did not request an exemption from the Vaccination Policy as an accommodation. JA908.

Wilkins-Bailey argues that the District Court erred in finding that Hilborn is not Wilkins-Bailey's comparator. Doc. 13, at 32. She claims it is up to a court to interpret on a case-by-case basis what "similar in all relevant respects" means for purposes of establishing a comparator, and she argues that the only relevant respect here is the refusal to get vaccinated.[5] However, she cites *no authority* in support of this standard, which ignores the many ways in which Hilborn's circumstance differentiated from Wilkins-Bailey's. *Id.* at 33-35. Indeed, Wilkins-Bailey ignores binding Fourth Circuit authority that clearly requires comparators to have been subject to the

[5] Wilkins-Bailey also argues that "[i]n holding that Hilborn is now not a comparator," the District Court "punished" her for conducting discovery into other employees who requested accommodations. *See* Doc. 13, at 34. But the District Court never ruled—nor did Essity ever concede—that Hilborn (or the broader category of unvaccinated employees) was Wilkins-Bailey's comparator.

same standards and to have engaged in the same conduct, *without differentiating circumstances*. *See Haynes*, 922 F.3d at 223-24 (quoting *Haywood*, 387 F. App'x at 359).

Wilkins-Bailey provides no evidence that Hilborn was similarly situated to her in any respect, other than declining to receive the COVID-19 vaccine. *See* Doc. 13, at 35; *see also Hurst v. D.C.*, 681 F. App'x 186, 191 (4th Cir. 2017). Wilkins-Bailey worked on a different team for a different supervisor in a different role from Hilborn. JA613-614, at 61:10-62:24. Even more crucially, however, they did not engage in the same conduct; Hilborn *did not request an accommodation* with respect to the Vaccination Policy, opting instead to retire. Hilborn is therefore not similarly situated to Wilkins-Bailey in the most crucial respect, let alone in *all* relevant respects. *See Spencer*, 919 F.3d at 207-08; *see also* JA837, at 34:10-14 ("[T]o the extent that Ms. Wilkins-Bailey alleges that she was treated unfairly based on her race in the decision to deny her accommodation request, Ms. Hilborn is not an appropriate comparator because she didn't go through that same process at all.").

Even setting aside their differing conduct with respect to requesting accommodations, Hilborn is *still* not Wilkins-Bailey's comparator as it relates to the timing of their respective separations. Granted, Hilborn, like Wilkins-Bailey, was required to comply with the Vaccination Policy (i.e., they were "subject to the same stand-

ards"); however, rather than remain unvaccinated and have her employment terminated, Hilborn voluntarily retired. JA616-617, at 64:20-65:3; JA623-624, at 71:18-72:1; JA627-628, at 83:2-84:24; JA631, at 87:11-20; SA15, ¶ 5. Hilborn was permitted to remain actively employed through December 31, 2021, in exchange for her voluntary separation, but Wilkins-Bailey refused to consider a similar arrangement that was offered to her. JA476-479, at 16:21-19:18; JA481-483, at 21:14-23:12; JA489, at 33:16-25; SA3-10. They therefore did not engage in the same conduct as it relates to their separations from Essity and, consequently, are not comparators.[6]

After her separation, Hilborn performed work for Essity as an independent contractor at her manager's request, in light of unique business challenges her retirement caused for the rebates department. JA637-641, at 93:12-97:22; JA652, at 112:11-18; SA15-16, ¶¶ 7-10. The termination of Wilkins-Bailey's employment did not create the same challenges and, indeed, the two belonged to different teams, worked for different supervisors, and performed different roles. There are, therefore, myriad "differentiating or mitigating circumstances" that would explain why Essity allowed Hilborn to work as an independent contractor but not Wilkins-Bailey. *See Haynes*, 922 F.3d at 223-24. Additionally, despite Wilkins-Bailey's suggestion to

[6] Even if Hilborn was a comparator to Wilkins-Bailey (she is not), the fact that Essity offered the same arrangement to Wilkins-Bailey—namely, her voluntary resignation in exchange for an additional month of paid employment—shows that Hilborn was not treated more favorably than Wilkins-Bailey. Wilkins-Bailey's disparate treatment claim therefore fails for this independent reason.

the contrary (*see* Doc. 13, at 38), Essity's Vaccination Requirement applied only to U.S. office and sales employees. JA342, at 179:13-15; JA392-399. As a remote contractor, Hilborn was explicitly not covered by that policy, so Essity did not exempt her from the policy by allowing her to perform work for the company after her separation while unvaccinated. SA16, ¶ 11. Finally, the one other former employee Essity offered to engage as an independent contractor is Black—evidence that this arrangement was not offered only to non-Black employees. JA655-656, at 127:17-128:22; SA16, ¶ 12. Put differently, while Essity's Vaccination Policy did not explicitly contemplate such an arrangement (nor did it apply to non-office or sales employees), it was made equally available to Black and non-Black employees.

In every relevant context—the denial of Wilkins-Bailey's accommodation request, the separation of Wilkins-Bailey's employment before Hilborn's, and the decision not to engage Wilkins-Bailey as an independent contractor—Hilborn and Wilkins-Bailey engaged in different conduct and therefore are not comparators. The District Court correctly granted summary judgment to Essity on this basis.

### B. The District Court Correctly Applied the Disparate Treatment Analysis to Wilkins-Bailey's Race Discrimination Claim.

The District Court assumed, without deciding, that the non-Black employees who applied for exemptions from the Vaccination Policy were Wilkins-Bailey's comparators. *See* JA909. Nonetheless, the District Court correctly concluded that the record contains no evidence that Wilkins-Bailey was treated less favorably than

those employees based on her race. *Id.* Specifically, the District Court held that the record contains no evidence that would "demonstrate a preference for white employees over Black employees with respect to religious accommodation requests." JA912.

Wilkins-Bailey argues that, in so holding, the District Court improperly applied a disparate *impact* analysis. *See* Doc. 13, at 42-43. That is incorrect. *See generally* JA909-912. Rather, the District Court did exactly what Wilkins-Bailey asked it to do—analyze the accommodation requests of the non-Black "comparators" she identified to determine whether the requests would permit a factfinder to conclude that those non-Black employees were treated more favorably than Wilkins-Bailey based on her race. *See* JA867, at 64:20-22 ("We're doing one-on-one analysis . . . with each of them. What happened outside of that is irrelevant."). The District Court appropriately held that they would not.

Wilkins-Bailey also takes issue with the District Court's individual analyses of the accommodation requests of the non-Black "comparators" who mentioned fetal cells in their accommodation requests. Specifically, she claims that whereas Essity penalized her for mentioning a connection between the COVID-19 vaccine and fetal cells in her request, Essity granted the requests of other employees who discussed fetal cells in much greater detail. *See* Doc. 13, at 41-42. This argument intentionally obfuscates Essity's explanation. Whereas Wilkins-Bailey merely referenced the use

of "precious fetus/human samples [] *in* these Covid 19 injections" (*see* JA405 (emphasis added)), other employees more accurately referenced the use of fetal cells in the development and/or manufacturing of the COVID-19 vaccines (*see generally* JA943-988). Moreover, whereas other employees explained that they could not receive the COVID-19 vaccines because their religious beliefs prohibited them from being complicit in abortion, Wilkins-Bailey made no attempt to connect the use of fetal cells in the development of the COVID-19 vaccines to her religious beliefs. *See id.* The table below, comparing fetal cell-related language from requests that Essity approved with language from Wilkins-Bailey's request, illustrates this point:

| **Comparator ID No.** | **Fetal Cell-Related Language from Approved Request** | **Parallel Language in Wilkins-Bailey's Request** |
|---|---|---|
| 15 | "[I] do not support or believe in abortion as well as birth control. According to the research I have completed to make an informed decision about the vaccines, I have found that the production of said vaccines have used fetal cell lines of aborted fetus's in the testing and production phases. This is where my sincerely held religious belief's come into play as I have a strong stance against abortion as I believe that all human life is sacred and begins at the moment of conception." JA951. | "I am a *non perfect* humble Christian but the substances (i.e., experimental tech to precious fetus/human samples etc) in these Covid 19 injections prevent me from getting any Covid-19 vaccination due to my <u>closely held religious beliefs</u>." JA405. |
| 24 | "All three covid-19 vaccines use cell lines originating from aborted babies in their manufacturing and testing. As a Christian, I believe life begins at conception. . . . It is | "I am a *non perfect* humble Christian but the substances (i.e., experimental tech to precious fetus/human samples etc) |



PPAB 13140790v1

| | | |
|---|---|---|
| | also my sincere religious belief that abortion is the willful termination of God-given life which is forbidden by the ten commandments. . . . I am not opposed to all vaccines. I'm opposed to these 3 vaccines and all other medications that use fetal tissue from aborted babies to manufacture and test their products." JA970. | in these Covid 19 injections prevent me from getting any Covid-19 vaccination due to my <u>closely held religious beliefs</u>." JA405. |
| 26 | "I have strong convictions concerning abortion. Fetal cells were used in the making and testing of the Covid-19 vaccines. . . . I believe that receiving the Covid-19 vaccine would be a violation of my conscience and supports the killing of unborn children in the womb." JA976.<br><br>"Fetal cells were used in various stages of the Covid-19 vaccine development and manufacturing. Aborting a fetus is Murder and I will not support it. The Covid-19 vaccine also defiles my body. I honor my body as God requires us to Glorify our bodies as A temple of the Holy Spirit." JA980. | "I am a *non perfect* humble Christian but the substances (i.e., experimental tech to precious fetus/human samples etc) in these Covid 19 injections prevent me from getting any Covid-19 vaccination due to my <u>closely held religious beliefs</u>." JA405. |
| 27 | "It is my sincere religious belief that human life begins at conception. . . . I believe that abortion is murder to the fullest extent. The Moderna and Pfizer vaccinations for COVID-19 both used aborted fetal tissue in the testing process, and those manufactured by AstraZeneca and Johnson & Johnson used aborted fetal tissue in every | "I am a *non perfect* humble Christian but the substances (i.e., experimental tech to precious fetus/human samples etc) in these Covid 19 injections prevent me from getting any Covid-19 vaccination due to my <u>closely held religious beliefs</u>." JA405. |

| | | |
|---|---|---|
| | step of the process — development, production, and lab testing. The vaccines violate my sincere religious belief with being vaccinated with any of the current available COVID-19 vaccine options I would be cooperating with and participating in abortion practices which ends an innocent human life." JA984. | |

In contrast to Wilkins-Bailey's cursory, inaccurate suggestion that COVID-19 vaccines contain "fetus/human samples" and "experimental tech" (*see* JA405), the language from the requests that Essity approved made clear that the employees submitting them had religious beliefs that abortion is wrong, and they believed that receiving a COVID-19 vaccine would violate their anti-abortion beliefs because the vaccines were developed using cells from an aborted fetus. *See generally* JA943-988.

Essity denied the religious accommodation requests of many white employees who, like Wilkins-Bailey, failed to connect their objections to the COVID-19 vaccine with their alleged religious beliefs. *See* JA990-1056. Several of the white employees whose accommodation requests Essity denied also referenced fetal cells in their requests, just as Wilkins-Bailey did. *See id.* When reviewed as a whole, the completely unique and distinguishable accommodation requests that white employ-

ees submitted to Essity—more of which Essity denied than approved—are insufficient to permit a factfinder to conclude that Essity treated Wilkins-Bailey less favorably than similarly situated white employees in the accommodation process.

Individual accommodation requests aside, statistical data is not per se irrelevant to disparate treatment claims. In fact, statistical evidence is considered "unquestionably relevant" in disparate treatment cases. *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994). But no reasonable factfinder could interpret the statistical data in this case as evidence that Essity preferred non-Black employees. Essity granted 29.03% of the religious exemption requests it received from white employees, 42.86% of the requests it received from all non-white employees, and 33.33% of the religious exemption requests it received from Black employees. JA199, ¶ 9. This data, which shows Black employees fared better than non-Black employees in Essity's religious accommodation process, contains no evidence that would support a finding that Essity discriminated against Black employees.

Ignoring this data, Wilkins-Bailey attempts to support her race discrimination claim entirely with speculation, which is insufficient to create an issue of fact. *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280-81 (4th Cir. 2000) (finding that employee who did "nothing more than speculate that [his employer] terminated [him] out of racial animus" could not show pretext) (citing *Williams v. Cerberonics, Inc.*,

871 F.2d 452, 456 (4th Cir. 1989)). Because Wilkins-Bailey has not identified any actual evidence that would support a finding that Essity discriminated against her based on race, the District Court correctly granted summary judgment in favor of Essity on Wilkins-Bailey's race discrimination claim.

## CONCLUSION

For the foregoing reasons, Essity respectfully requests that the Court affirm the District Court's order granting Essity's motion for summary judgment in full.

Dated: December 15, 2025

Respectfully submitted,

*/s/ Tory Ian Summey*

TORY IAN SUMMEY
ELIZABETH CARSON LANE
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000

STEPHANIE SCHUSTER
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

EMILY CUNEO DESMEDT
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ 08540
(609) 919-6600

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excluding the portions of the document exempted by Rule 32(f), it contains 9,399 words.

This brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman 14-point font.

Dated: December 15, 2025

s/ *Tory Ian Summey*
TORY IAN SUMMEY

*Counsel for Defendant-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2025, I electronically filed the foregoing Response Brief of Defendant-Appellee with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the ECF NextGen system and that all participants in the case are registered ECF NextGen users and service will be accomplished through the ECF NextGen system.

Dated: December 15, 2025

s/ *Tory Ian Summey*
TORY IAN SUMMEY

*Counsel for Defendant-Appellee*